IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

NESTOR MEDINA,
#N90665,

                    Plaintiff,

    v.

WEXFORD HEALTH SOURCES INC.,
FELICIA ADKINS,
DR J EK,
JENNIFER A CHACON,
PAULA LAHEY,
MS. MARY,
ASHLEY DRANELL,
DEEDEE BROOKHART,
DR. PITTMAN,
DR. VIPIN K. SHAH,
M. WISE,
LUKING,
THOMANN,
MS. CUNNINGHAM,
JANE DOE 1,
JANE DOE 2, and
LATOYA HUGHES,

                    Defendants.

Case No. 24-cv-01532-SPM

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

       Plaintiff Nestor Medina, an inmate of the Illinois Department of Corrections (IDOC) who is currently incarcerated at Danville Correctional Center, brings this civil action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights that occurred at Lawrence Correctional Center and Danville Correctional Center. The Complaint is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. Under Section 1915A, any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or requests

money damages from a defendant who by law is immune from such relief must be dismissed. *See* 28 U.S.C. § 1915A(b). At this juncture, the factual allegations of the pro se complaint are to be liberally construed. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

### THE COMPLAINT

In the Complaint, Plaintiff describes the repeated delay and denial of medical care for his knee and associated injuries over the period of several years while incarcerated at Lawrence Correctional Center and Danville Correctional Center.

Plaintiff alleges that on July 26, 2019, while incarcerated at Lawrence Correctional Center (Lawrence), he had a medical appointment with Dr. Pittman because his right knee was "giving out," and he was falling. (Doc. 1, p. 5). Dr. Pittman informed Plaintiff that he has ACL/MCL deficient knees and prescribed Plaintiff a knee sleeve for stability. (*Id.*).

Following the appointment, Plaintiff's right knee continued to worsen. (Doc. 1, p. 6). Plaintiff's knee would "give way" causing him to fall and hurt himself. He was issued a low bunk permit because he was having difficulty climbing down from his top bunk bed. Plaintiff had another appointment with Dr. Pittman on October 10, 2019. Dr. Pittman instructed Plaintiff to continue wearing the knee sleeve and exercise. Plaintiff requested an ADA gym permit to exercise but was told by a nurse that he did not meet the requirements. (*Id.*).

On January 2, 2020, Plaintiff had an appointment with a nurse practitioner. (Doc. 1, p. 6). He explained that all exercise areas were located on concrete and that walking on concrete for exercise was making his knee pain worse. The nurse practitioner instructed Plaintiff to modify his exercise and do the best he could. His knee condition did not improve. Plaintiff sent requests to the health care unit that went unanswered, and he was not scheduled for an appointment with a medical provider. (*Id.*).

Finally, on May 30, 2020, Plaintiff was seen by a nurse. (Doc. 1, p. 6). Plaintiff informed

the nurse that exercising on concrete was too painful and requested to have his knee surgically repaired or to transfer him to a facility where he could exercise properly. The nurse referred him to see a medical doctor at the facility. (*Id.*).

On June 3, 2020, Plaintiff had an appointment with Nurse Practitioner Luking. (Doc. 1, p. 6). Plaintiff explained that his problems with his right knee were becoming worse. He requested a transfer or surgical repair. Luking examined him and ordered an x-ray and for Plaintiff to see the doctor. Plaintiff was not, however, scheduled to see a doctor. (*Id.*).

At some point in June 2020, Plaintiff twisted his knee. (Doc. 1, p. 6). He was again referred to the doctor. Plaintiff was seen by Dr. Pittman on July 2. Dr. Pittman recorded that Plaintiff had "Bil. DJD/Loss of cartilage and ACL/MCL injury." Plaintiff requested an MRI and for a transfer so that he could exercise properly. Dr. Pittman responded, "Let's see what happens." Dr. Pittman "put him in" for a follow-up appointment in two weeks and gave Plaintiff vitamins. The follow-up appointment was never scheduled. (*Id.*).

Plaintiff had an appointment with a nurse practitioner on July 29, 2020, after complaining about knee pain. (Doc. 1, p. 7). The nurse practitioner recorded that Plaintiff was to have a follow-up appointment in four weeks. She prescribed pain pills and exercise. (*Id.*).

On September 14, 2020, Plaintiff was seen again by a nurse practitioner. (Doc. 1, p. 7). The nurse practitioner noted in his medical records that he was experiencing knee pain and his knee was "going out." She instructed Plaintiff to do minimal walking because he was ACL/MCL deficient. The nurse practitioner also prescribed a cane to help with stability. (*Id.*).

Plaintiff continued to complain of knee pain, and he was seen ten days later by Dr. Shah. (Doc. 1, p. 7). Plaintiff requested to see an orthopedic doctor because his condition was worsening. Dr. Shah told Plaintiff that he would receive more knee sleeves for stabilization and that Plaintiff would have to learn to live with the pain and falling because he, Dr. Shah, was not going to do

Page 3 of 22

anything else for him. (*Id.*).

On December 9, 2020, Plaintiff was seen by Nurse Baker after falling and injuring his shoulder while doing his prescribed physical therapy exercises. (Doc. 1, p. 7). She referred Plaintiff to see a doctor, but an appointment was not scheduled. (*Id.*).

On February 14, 2021, Plaintiff had another appointment with Nurse Baker for knee pain. (Doc. 1, p. 7). She recorded notes in his medical records and referred him to a doctor. An appointment with a doctor was never scheduled. Plaintiff was seen by Nurse Baker for a third time on February 24, after he injured his knee while moving cells. Baker "put him in for the M.D. line." (*Id.*).

On March 16, 2021, Plaintiff had an appointment with a new doctor, Dr. Williams. (Doc. 1, p. 8). Plaintiff explained his knee problems and history. Plaintiff asserts that Dr. Williams could not understand how Plaintiff had been walking around in his condition or why Plaintiff had not been sent for an MRI or to see an orthopedic doctor. Dr. Williams ordered an MRI and for Plaintiff to see an orthopedic doctor. Shortly after Plaintiff's appointment, Dr. Williams quit. (*Id.*).

From March 2021 through September 2021, Plaintiff repeatedly submitted requests to the health care unit because he continued to twist his knee, fall, and injure himself. (Doc. 1, p. 8). Plaintiff injured his shoulder again on September 19, 2021, after his knee buckled. (*Id.*).

Six months after Dr. Williams' referrals, Plaintiff finally saw an orthopedic specialist on September 27, 2021. (Doc. 1, p. 8). The specialist told Plaintiff that he needed reconstructive surgery. Plaintiff had an appointment with the same specialist again on October 25, and the specialist confirmed the need for surgery. The specialist referred Plaintiff to an orthopedic surgeon. (*Id.*).

At Lawrence, Plaintiff had a follow-up appointment with Dr. Savino, who noted that Plaintiff needed surgery "a.s.a.p." (Doc. 1, p. 8). Plaintiff saw the surgeon on November 16, 2021.

The surgeon ordered an MRI and a return visit to discuss surgical options. Plaintiff had an MRI on December 29. The imaging confirmed an ACL/MCL deficient knee. (*Id.*).

During this time, Plaintiff states that he continued to fall and hurt himself. (Doc. 1, p. 9). On February 2, 2022, Plaintiff's knee buckled, and he hit his shoulder on a metal post. He requested a medical appointment but did not see a medical provider. Plaintiff saw a nurse on February 26, and was referred to a doctor. (*Id.*).

Plaintiff had an appointment with Nurse Practitioner Luking on March 1, 2022. (Doc. 1, p. 9). At the appointment, Plaintiff complained of extreme shoulder pain, and Luking ordered an x-ray. Plaintiff saw Luking again on March 17, and he asked about the status of his knee surgery. Luking said that she did not have any information about his knee surgery. The next day, Plaintiff had an appointment with Nurse Practitioner Wise. Wise informed Plaintiff that the surgeon had notified Lawrence back on January 12 that he would not perform the surgery because following surgery, Plaintiff would need a brace and crutches, and Lawrence would not provide those devices. Wise told Plaintiff that he would be sent for a second opinion. Plaintiff asked about being issued a brace, and Wise told Plaintiff, "Let's wait to see what the second opinion ortho says." Plaintiff also expressed his irritation with having to wait two months for information about the surgery. (*Id.*).

On March 21, 2022, Plaintiff fell and injured his left pinky trying to catch himself. (Doc. 1, p. 9). His pinky was swollen and deformed. An x-ray was taken of his pinky. (*Id.*).

Since injuring his shoulder in February 2022, Plaintiff experienced pain. (Doc. 9-10). On May 28, Plaintiff heard and felt a tear in his left shoulder as he was moving his property box. He sent a request to see a medical provider to the health care unit. By May 31, Plaintiff was in extreme pain and could not move his shoulder, arm, or neck. He sent an emergency request for a "med-tech" through correctional officers. The officers called the health care unit, and they were told that

his request for emergency care had been denied. Plaintiff was told that he would see Nurse Practitioner Wise in a couple of days. (*Id.*).

Plaintiff had an appointment with an orthopedic specialist for a second opinion about his knee on June 8, 2022. (Doc. 1, p. 10). The specialist stated that Plaintiff's ACL had torn and to "get him an ACL brace." The specialist wrote a prescription for a brace. (*Id.*).

On June 10, 2022, Plaintiff was seen by Nurse Practitioner Wise for his shoulder. (Doc. 1, p. 10). Plaintiff explained "about the ripping and tearing of his shoulder and that his bicep has fallen." Wise ordered physical therapy. Plaintiff asked why he was not being seen by a doctor, and Wise responded that the physical therapist would decide if evaluation by a doctor was needed. Wise then asked Plaintiff about the visit with the orthopedic specialist. Plaintiff told her that he prescribed an ACL brace. (*Id.*). Wise said she would pass on the information. (*Id.* at p. 11).

On June 24, 2022, Physical Therapist Assistant Gaither came to Plaintiff's cell for a "cane inventory check." (Doc. 1, p. 11). Gaither noticed that Plaintiff was not using his left arm and that his shoulder was drooping. Gaither brought Plaintiff a sling. Gaither saw Wise and told her how bad Plaintiff's shoulder looked and how bad the pain was for him. Wise ordered an MRI. (*Id.*).

On June 28, 2022, Plaintiff had physical therapy, but he was unable to perform the exercises because of the pain. Dr. Thomann, the physical therapist, tried to force Plaintiff to do the movements, but he could not. Plaintiff was having trouble moving his neck, but Thomann continued to try and move it. Plaintiff states that he finally told her to stop because the pain was too great. The next day, Wise told Plaintiff that an x-ray was scheduled because Thomann believed there might be a neck problem. Wise still did not send Plaintiff to see a doctor. (*Id.*).

On July 12, 2022, Plaintiff went back to physical therapy for his shoulder and knee. (Doc. 1, p. 11). Plaintiff told Thomann that his shoulder and arm hurt too much to do the exercises and that he wanted to wait for a doctor to diagnose him before she tried to fix him. Again, Thomann

tried to make Plaintiff do the exercises, and he told her to stop because it hurt too much. Thomann then attempted to lift, twist, and pull Plaintiff's leg. Plaintiff told Thomann that he felt his knee popping out of place and that the movement caused pain. He stated that he wanted to wait for his ACL brace before exercising. Thomann told Plaintiff to leave, and she took his cane without explanation. Following the appointment, Plaintiff wrote to Cunningham, the health care unit administrator, about his brace and shoulder, but he did not receive a response. (*Id.*).

On July 18, 2022, Plaintiff was sent for an MRI for his shoulder. (Doc. 1, p. 11). On July 25, Plaintiff had an appointment with Nurse Practitioner Luking to discuss the results. (*Id.* at p. 12). The MRI showed "a full thickness tear of supraspinatus and long head bicep tear and partial thickness superior subscapularis tendon tear." Luking also told Plaintiff that the surgery needed for his knee was not going to be performed because of the type of brace that was needed for recovery. She said she would communicate that recovery could be done in the infirmary with the brace. (*Id.*).

On August 1, 2022, a nurse retrieved the knee sleeves from Plaintiff at Luking's direction. (Doc. 1, p. 12). When Plaintiff wrote a grievance complaining that the knee sleeves had been taken, he received a response from Dr. Babich of Wexford informing him that knee sleeves were for comfort, not stability. Plaintiff asserts that he should never have been given knee sleeves for stability and that he should have been issued a brace from the start to prevent two years of falling and further injury. (*Id.*).

On August 4, 2022, Plaintiff twisted his knee very badly. (Doc. 1, p. 12). He was seen by Nurse Practitioner Luking. She informed Plaintiff that an IDOC physician and Dr. Babich were waiting on a sample brace for approval and that Plaintiff just needed to wait. On August 19, 2022, the orthopedic surgeon contacted Plaintiff's sister about the results from the MRI of Plaintiff's shoulder. The surgeon believed that Plaintiff needed immediate attention, and the surgeon was

unable to reach the health care unit at Lawrence to relay the message. After several attempts, Plaintiff's sister eventually reached the health care united and passed on the message. (*Id.*).

On August 20, 2022, Dr. Meyer examined Plaintiff's left pinky. (Doc. 1, p. 12). Plaintiff continued to have pain and trouble using it following his previous fall in March. Dr. Meyer believed that Plaintiff may have nerve damage but stated there was nothing that could be done. (*Id.*).

On September 27, 2022, Plaintiff went back to the first orthopedic surgeon who had previously declined to perform surgery on Plaintiff's knee because Lawrence would not be able to provide proper post-operation care. (Doc. 1, p. 13). The surgeon recommended another doctor, "in hopes that he may take the risk." The surgeon stated that "time was of the up most importance." Two days later, Plaintiff was informed that the sample brace had been submitted to Springfield security for approval. In October, the warden at Lawrence was shown a picture of the brace and agreed to see the sample. Plaintiff wrote to Cunningham and requested a medical transfer to a facility that already provided the ACL brace. Cunningham did not respond. (*Id.*).

Plaintiff had a physical therapy appointment on October 25, 2022, to exercise his shoulder. (Doc. 1, p. 13). Again, Plaintiff told the "D.P.T." that it was too painful and that he had been advised by one of the orthopedic specialists to avoid doing anything painful. The D.P.T. did not agree and wanted Plaintiff to sign a treatment refusal. Plaintiff would not. (*Id.*).

Plaintiff saw an orthopedic specialist for his shoulder on November 16, 2022. (Doc. 1, p. 13). The specialist agreed that surgery was needed but because of the long delay, the specialist said that "the window for the best outcome [had] past, especially for the bicep, it may not be saved." (*Id.*).

Plaintiff continued to fall and experience pain. (Doc. 1, p. 13). He wrote the health care unit about his ongoing issues. In January 2023, Plaintiff was told that he had been referred for

Page 8 of 22

another MRI and appointment with an orthopedic specialist. While waiting for these appointments to be approved, Plaintiff went over a dozen times to physical therapy for knee and shoulder exercises. (*Id.*). Plaintiff continued to inform the physical therapist that he could not perform the movements because of pain, but Plaintiff would always decline to sign a treatment refusal form. (*Id.* at p. 14). Plaintiff was approved for orthopedic visits for his knee and shoulder and two MRIs in February. His condition deteriorated, and he was placed on "lay-in" status and fed in his cell because of his pain and inability to use his shoulder and arm. Before he could attend these appointments, Plaintiff was transferred to Danville Correctional Center (Danville) in April 2023. (*Id.*).

Once at Danville, Plaintiff continued to be denied timely and adequate medical care. (Doc. 1, p. 14). He had an appointment with a nurse on May 4, 2023, and explained his medical situation. The nurse put his name on the list to see the doctor. Plaintiff's knee buckled on May 19 and 25. He requested to see the doctor twice but was not scheduled. Plaintiff saw Dr. EK on June 5, but Dr. EK would only discuss Plaintiff's cholesterol and refused to talk to him about his knee or shoulder. (*Id.*).

Plaintiff sent a letter to the ADA coordinator, Ms. Lahey, about his ACL brace that was prescribed to him. (Doc. 1, p. 15). Ms. Lahey responded that she needed Dr. EK's approval and that Plaintiff had been added to Dr. EK's schedule in the next few days. On June 7, 2023, Plaintiff received a call pass to see Dr. EK, but when he arrived at the health care unit, Dr. EK refused to see him. Plaintiff continued to submit requests to see a doctor, and he also filed a grievance because his instability was becoming more extreme.

Plaintiff injured his shoulder and was seen by a nurse on July 14, 2023. (Doc. 1, p. 15). During the appointment he was told that there was no record of an ACL brace being prescribed. Plaintiff gave the nurse copies of his medical records, and the nurse said she would pass them on

to Ms. Babbs who orders the braces. He had an MRI on his shoulder on July 19, which showed that surgery was needed. Plaintiff had an MRI on his knee on August 8, and again, the results confirmed an ACL/MCL deficient knee. Plaintiff hurt his knee on August 25, and requested to see a medical provider. (*Id.*).

Plaintiff was not seen for his knee or shoulder until September 4, 2023. (Doc. 1, p. 16). Plaintiff was seen by Physician Assistant Mo. Mo agreed that Plaintiff needed an ACL brace and told Plaintiff that he, Mo, would request for Dr. EK to sign off on approval for a brace. (*Id.*).

On September 4, 2023, Plaintiff wrote to Health Care Administrator Chacon and asked about the status of his brace. Chacon responded that she was not sure he still needed it. Plaintiff informed Chacon that he had an MRI on August 8 that demonstrated that he did need the brace. Plaintiff also sent a letter to ADA Coordinator Lahey asking about his brace. Lahey instructed Plaintiff to continue wearing the knee sleeve and that she would continue to monitor his progress. (*Id.*).

On September 17, 2023, Plaintiff was seen by an orthopedic surgeon for his shoulder, and the surgeon ordered surgery. (Doc. 1, p. 16). On October 23, Plaintiff had a pre-operation physical with Nurse Practitioner Mary. Plaintiff asked about his ACL brace, and Mary responded, "We are not here for that," and would not answer any questions relating to the brace. Plaintiff had surgery on his shoulder the following day. (*Id.*).

After his shoulder surgery, Plaintiff sent a letter to Chacon and Lahey because he was concerned about falling with his bad shoulder. (Doc. 1, p. 16). In the letter, Plaintiff asked who was responsible for approving the ACL brace. He did not receive a response. (*Id.*).

Plaintiff had a follow-up appointment with the shoulder surgeon on November 8, 2023. (Doc. 1, p. 16). The surgeon told Plaintiff that he could not repair the bicep because too much time had past between the injury and the surgery. The surgeon prescribed physical therapy two times

per week for up to ten weeks. (*Id.*). From November 2023 through January 24, 2024, Plaintiff was sent to physical therapy only three times. Plaintiff had an appointment with the surgeon on January 24, and the surgeon instructed Plaintiff to continue with physical therapy until the next follow-up appointment in six weeks. (*Id.*).

Plaintiff did not have another physical therapy appointment until February 2, 2024. (Doc. 1, p. 17). During the appointment, the physical therapist mentioned that Plaintiff may have "nerve/spine" issues because of the bicep and arm pain Plaintiff was experiencing. (*Id.* at p. 18). Plaintiff saw Dr. EK on February 20. Dr. EK did not discuss the status of Plaintiff's ACL brace or examine his knee. In response to Plaintiff's questions about his brace, Dr. EK replied, "We are here just to tell you P.T. will end soon, good bye." (*Id.*).

Plaintiff against saw Dr. EK on March 6, 2024. Plaintiff told Dr. EK about the comments the physical therapist had made about the "nerve/spine concerns." (Doc. 1, p. 18). Dr. EK stated, "They are not doctors, I don't care." Dr. EK told Plaintiff to leave without making any treatment decisions about potential nerve and spinal problems he was experiencing. On his way out of the exam room, Dr. EK told Plaintiff, "Don't forget your notes, I know you love to take notes." (*Id.*).

In March 2024, Plaintiff wrote to the health care unit because his left bicep and arm were in pain and his knee continued to buckle and cause pain. (Doc. 1, p. 18). Plaintiff saw Nurse Practitioner Mary on March 28. Plaintiff asked Mary about his brace, and Mary responded that she did not find any information regarding the brace. Plaintiff gave Mary copies of his medical records recording that he needed to be fitted for an ACL brace and that he was waiting on approval by administrative officials of a sample brace. Mary disregarded these documents. Plaintiff asked Mary to call Dr. Babich at Wexford or medical staff at Lawrence to clear up the issue. She refused. Mary instructed Plaintiff to wait for his next appointment with the orthopedic doctor. (*Id.*).

Plaintiff saw an orthopedic surgeon on April 1, 2024. (Doc. 1, p. 19). The surgeon took

Page 11 of 22

x-rays and looked at the MRI. (*Id.* at p. 20). The surgeon told Plaintiff that his right knee will never "be close to 100%" and that an ACL brace will always be needed." Plaintiff told the surgeon that his left knee is now also starting to hurt. The surgeon told Plaintiff that the ACL is slightly torn in his left knee and the left knee is compensating for the right knee. The surgeon explained that if the issues with the right knee are not addressed, then the left knee will be seriously impacted and possibly his hips as well. The surgeon told Plaintiff that the recommended treatment would be a two-part process. Plaintiff will be required to wear an ACL brace for three months and if the knee feels stable, then a fitted brace will be ordered. If the knee does not feel stable, then surgery will be performed, and an ACL brace prescribed. The surgeon stated that Plaintiff needed the brace now, and the surgeon's assistant fitted Plaintiff for a brace. (*Id.*).

When Plaintiff returned to Danville from his appointment, the Director of Nursing, Ashley Darnell, aggressively asked him, "Why did you let the ortho give you that brace…you should know that it is not allowed here." (Doc. 1, p. 20). Plaintiff explained his medical history and his conversations with the surgeon. Darnell refused to let him wear it and removed the brace. (*Id.*).

On April 3, 2024, Plaintiff had an appointment with Nurse Practitioner Mary. (Doc. 1-1, p. 1). Plaintiff informed Mary that Darnell had taken his brace. Mary stated that Dr. EK had "signed off on the brace" on April 1, 2024. Mary told Plaintiff she would look into the situation. (*Id.*).

Plaintiff went to the health care unit on April 5, 2024. (Doc. 1-1, p. 1). A nurse gave Plaintiff a brace that was not the one put on him at the surgeon's office. Plaintiff told the nurse, "I don't want that one." The nurse left and returned with Darnell. Plaintiff explained to Darnell that the current brace was not the same as what was issued to him by the surgeon. Plaintiff stated that the brace had been tampered with and altered. The supports had been removed. Darnell told Plaintiff that he was not allowed to have that kind of brace at Danville. Plaintiff asked to be transferred to a facility where the device is approved and allowed. Darnell told Plaintiff, "that's

not my job," and threw the brace at him. (*Id.*).

On April 7, 2024, Plaintiff was seen by a nurse for knee pain. (Doc. 1-1, p. 1). The nurse told him that he soon had a follow-up appointment with Nurse Practitioner Mary and gave him pain medication. As of June 20, 2024, Plaintiff had still not been seen by a nurse practitioner or doctor. (*Id.*).

### PRELIMINARY DISMISSALS

The Court dismisses without prejudice all claims against Wexford Health Source Inc. (Wexford). Plaintiff claims that Wexford (1) has a policy and/or practice that is deliberately indifferent to his known medical conditions; (2) carelessly and recklessly failed to perform its duty to ensure that his serious medical need was met; (3) failed to maintain adequate medical and administrative programs and failed to improve the quality of care for IDOC inmates in accordance with Illinois administrative rules and statutes; and (4) has a policy and/or practice of allowing and encouraging unqualified personnel to treat his medical condition and disability. (Doc. 1, p. 5). These conclusory statements are not supported by any factual allegations in the Complaint, and Plaintiff never alleges that the individual defendants were acting pursuant to or influenced by a Wexford policy or practice.[1] *See Jackson v. Bloomfield Police Dep't,* 764 F. App'x 557, 558 (7th Cir. 2019). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' to state a claim for relief." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Accordingly, the claims against Wexford Health Sources, Inc. are dismissed.

The Court also dismisses without prejudice all claims against Jane Does 1 and 2, who are described as nurse practitioners at Lawrence. (Doc. 1, p. 3). In the Complaint, Plaintiff describes

---

[1] When Plaintiff does mention a Wexford policy, it is to explain how individual defendants are acting contrary to that policy. Plaintiff repeatedly states he was wrongly given knee sleeves by individual Defendants, despite Wexford policy stating that knee sleeves are not for stabilization. (Doc. 1, p. 5, 7, 12).

his interactions with unnamed nurse practitioners (*Id.* at p. 6, 7), but he does not identify these individuals as either Jane Doe 1 or Jane Doe 2. In fact, Jane Does 1 and 2 are not mentioned anywhere in the "Statement of Facts" section of the Complaint. Merely listing a defendant in the case caption is not sufficient to state a claim. The defendant must be given "fair notice of what the…claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) Because Plaintiff does not clearly associate any allegations with Jane Does 1 and 2, any claims against them are dismissed.

For similar reasons, all claims are dismissed against DeeDee Brookhart, the warden at Lawrence. Plaintiff fails to describe any unconstitutional conduct on the part of Brookhart or her involvement in his medical care. The Court cannot infer liability simply because Brookhart is in a supervisory position or because she reviewed and denied his grievances. *See George v. Smith,* 507 F.3d 605, 609 (7th Cir. 2007); *See Brown v. Randle*, 847 F.3d 861, 865 (7th Cir. 2017).

### DISCUSSION

Based on Plaintiff's allegations and his articulation of his claims, the Court designates the following counts:

| | |
|---|---|
| **Count 1:** | Eighth Amendment claim against Pittman, Shah, Wise, Luking, Thomann, Cunningham, Adkins, EK, Chacon, Lahey, Mary, and Darnell for failing to provide Plaintiff constitutionally adequate care for his right knee condition. |
| **Count 2:** | Eighth Amendment claim against Pittman, Shah, Wise, Luking, Thomann, Cunningham, Adkins, EK, Chacon, Lahey, Mary, and Darnell for failing to provide Plaintiff constitutionally adequate care for his left shoulder. |
| **Count 3:** | ADA/RA claim against Defendants for failing to provide Plaintiff with a prescribed disability device. |
| **Count 4:** | First Amendment claim against Thomann for retaliating against Plaintiff by confiscating his cane. |
| **Count 5:** | First Amendment against Dr. EK for retaliating against Plaintiff by |

refusing to provide further evaluation and/or treatment for potential
nerve and spine issues.

The parties and the Court will use these designations in all future pleadings and orders, unless

otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the**

**Complaint but not addressed in this Order should be considered dismissed without prejudice**

**as inadequately pled under the *Twombly*[2] pleading standard.**

### Count 1

Count 1 will proceed against Dr. Pittman, Luking, Dr. Shah, Wise, Cunningham, Dr. EK,

Chacon, Lahey, Mary, and Darnell for delaying and/or denying Plaintiff constitutionally adequate

care for his right knee.

Count 1 will also proceed against Thomann, the physical therapist. Plaintiff claims that

after he refused to perform the prescribed exercises, Thomann "took his cane without explanation,"

leaving him "without support." (Doc. 1, p. 11). At this stage this is sufficient to state a colorable

Eighth Amendment claim.

Plaintiff has sufficiently pled a deliberate indifference claim against Adkins, the warden at

Danville. Plaintiff alleges that Adkins is aware that he is being denied medical treatment for his

knee based on "numerous emergency grievances that have been filed and sent to her," and she has

failed to act to rectify the situation. (Doc. 1, p. 21). *See Arnett v. Webster,* 658 F. 3d 742, 755-56

(7th Cir. 2011).

### Count 2

After Plaintiff injured his shoulder on February 2, 2022, Plaintiff was seen by Luking,

Wise, Thomann, and Dr. EK. Count 2 will proceed against Luking and Wise for failing to properly

and timely treat his shoulder injury. Count 2 will also proceed against Dr. EK for deliberate

---

[2] *Twombly,* 550 U.S. at 570.

indifference to Plaintiff's shoulder injury before and after surgery.

Count 2 will be dismissed, however, against Thomann, the physical therapist. Other than disagreeing with Thomann on her treatment decisions, the allegations in the Complaint are not sufficient for the Court to reasonably infer that Thomann acted with deliberate indifference towards Plaintiff's shoulder condition. (Doc. 1, p. 11). Plaintiff was refusing to do the exercises and so asking him to leave was not unreasonable. *See Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

Count 2 will proceed against Cunningham, the health care unit administrator at Lawrence. Plaintiff states that he submitted several requests to the health care unit requesting a medical appointment for his shoulder and was never seen. He also asserts that he wrote to Cunningham about his shoulder and received no response. (Doc. 1, p. 9-11). Furthermore, one of Plaintiff's specialists was unable to contact the health care unit regarding Plaintiff's care, and Plaintiff's sister eventually had to pass on the message that Plaintiff needed immediate care for his shoulder. (*Id.* at p. 12). These allegations are sufficient for the Court to infer that Cunningham knew Plaintiff was in need of further treatment for his shoulder and that her inaction amounted to deliberate indifference. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

Count 2 is dismissed as to the remaining Defendants – Pittman, Shah, Adkins, Chacon, Lahey, Mary, and Darnell. Plaintiff does not describe any involvement on the part of these individuals in the medical treatment of his shoulder.

## Count 3

Under the Americans with Disabilities Act (ADA), "no qualified individual with a disability shall, because of that disability . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2006). The Rehabilitation Act (RA) likewise prohibits discrimination against qualified

individuals based on a physical or mental disability. *See* 29 U.S.C. §§ 794-94e. The analysis under the ADA and the RA is the same, except that the RA includes as an additional requirement the receipt of federal funds, which all states accept for their prisons. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) (citing 29 U.S.C. § 705(2)(B)). Discrimination under both includes the failure to accommodate a disability. *Jaros*, 684 F.3d at 672 (citation omitted).

Plaintiff has stated an ADA/RA claim for failure to accommodate his disability by providing him with a knee brace. As the proper defendant is the agency or an individual in his or her official capacity, Count 3 will proceed against Director Hughes in her official capacity and is dismissed as to all other defendants. *See Jaros*, 684 F. 3d at 670 n. 2; *Brown v. Misner*, 2024 WL 328910, at *2 (E.D. Wisc. Jan. 29, 2024) (noting that the remainder of defendants cannot be sued under the ADA/RA in their personal capacities and an ADA/RA claim against the "remainder of the defendants in their 'official' capacity would be redundant…") (citations omitted).

### Counts 4 and 5

"First Amendment retaliation cases require the [plaintiff] to show that the speech or activity was constitutionally protected, a deprivation occurred to deter the protected speech or activity, and the speech or activity was at least a motivating factor in the decision to take retaliatory action." *Manuel v. Nalley,* 966 F.3d 678, 680 (7th Cir. 2020). "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation." *Id.* (citation omitted).

Plaintiff has stated enough facts for the Court to reasonably infer that Thomann confiscated his cane and Dr. EK refused to evaluate him for nerve or spine damage because he complained about his medical care. Counts 4 and 5 survive preliminary review.

### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff seeks a temporary restraining order (TRO) requiring Defendants to (1) arrange for him to be transferred to a facility that can accommodate his disability and provide him with a

Page 17 of 22

proper ACL brace; and (2) provide him with the medical treatment that he has been refused since transferring to Danville. (Doc. 2, p. 10). Plaintiff also asks for a preliminary injunction requiring Defendants to return to him the ACL brace that was confiscated by Darnell when he returned from the orthopedic specialist in April 2024 and to implement the treatment plan for his knee as recommended by the orthopedic specialist. (*Id.*).

To obtain preliminary injunctive relief, whether through a TRO or preliminary injunction, Plaintiff must demonstrate that (1) his underlying case has some likelihood of success; (2) no adequate remedy at law exists; and (3) he will suffer irreparable harm without the relief. *Merritte v. Kessel*, 561 F. App'x 546, 548 (7th Cir. 2014) (citations omitted).

Without expressing any opinion on the merits of any of Plaintiff's other claims for relief, the Court concludes that a TRO should not be issued in this matter. The Prison Litigation Reform Act requires that any grant of prospective relief, including TROs, "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" and cannot issue "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626. Federal courts must exercise equitable restraint when asked to take over the administration of a prison, something that is best left to correctional officials and their staff. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995); *Rizzo v. Goode*, 423 U.S. 362, 379 (1976). Plaintiff was seen by an orthopedic doctor on April 1, 2024 (Doc. 2, p. 38), and offered a brace upon his return from the appointment. Although he claims this brace his deficient and continues to not receive proper care, Plaintiff is receiving some treatment, and he has not demonstrated that "irreparable injury, loss, or damage will result…before the adverse party can be heard in opposition." FED. R. CIV. P. 65(b)(1)(A). Accordingly, the Court will not order Defendants to transfer Plaintiff or to provide him with a specific type of ACL brace or

medical care before they have had a chance to respond to the motion. The request for a TRO is **DENIED.**

The Court finds it concerning, however, that more than one specialist has concluded that Plaintiff is in need of a knee brace and/or surgery, years have passed, and Plaintiff has received neither treatment option. Therefore, his request for a preliminary injunction will remain pending until Defendants have been served. Defendants are directed respond to the request for a preliminary injunction within **14 days** of service of the pleadings in this case, at which point the Court will determine the need for a hearing on the motion requesting a preliminary injunction.

MOTION FOR RECRUITMENT OF COUNSEL

Plaintiff has filed a motion asking the Court to recruit counsel to represent him in this matter. (Doc. 4). Pursuant to 28 U.S.C. § 1915(e)(1), the Court "may request an attorney to represent any person unable to afford counsel." When faced with a motion for recruitment of counsel, the Court applies a two-part test: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007).

Here Plaintiff has provided copies of letters from several firms declining to take his case. Thus, he has met his threshold burden of making a reasonable attempt to find counsel himself prior to seeking assistance from the Court. Plaintiff, however, does not provide any reasons for why he is in need of counsel, and the Court finds that he is capable of proceeding pro se. Plaintiff's initial filings are coherent, well written, and include supporting exhibits and legal citations. He appears more than capable of adhering to court-imposed deadlines, conducting initial discovery, and otherwise litigating this matter on his own at this early stage. Should his situation change as the

case proceeds, Plaintiff may file another motion setting forth all facts that support his request for relief. For these reasons, the motion is **DENIED.**

D<small>ISPOSITION</small>

For the reasons stated above, the Complaint survives preliminary review pursuant to Section 1915A. **COUNT 1** shall proceed against Pittman, Shah, Wise, Luking, Thomann, Cunningham, Adkins, EK, Chacon, Lahey, Mary, and Darnell. **COUNT 2** shall proceed against Wise, Luking, Cunningham, and EK but is dismissed without prejudice as to Pittman, Shah, Thomann, Adkins, Chacon, Lahey, Mary, and Darnell. **COUNT 3** shall proceed against Hughes in her official capacity and is dismissed as to all other Defendants. **COUNT 4** shall proceed against Thomann. **COUNT 5** shall proceed against EK. The Clerk of Court **SHALL TERMINATE** Wexford Health Sources, Inc., Brookhart, and Jane Does 1 and 2 as parties on the docket, as there are no surviving claims against them.

Because Plaintiff claims involve his medical care, the Clerk of Court is **DIRECTED** to **ENTER** the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.

The Clerk of Court shall prepare for Pittman, Shah, Wise, Luking, Thomann, Cunningham, Hughes, Adkins, EK, Chacon, Lahey, Mary, and Darnell the following: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is directed to mail these forms, a copy of the Complaint and this Memorandum and Order to the defendants' place of employment. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the defendant, and the Court will require the defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, his or her last known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to file an appropriate responsive pleading to the Complaint in a timely manner and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants only need to respond to the issues stated in this Merit Review Order.**

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 14 days after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: July 1, 2024**

  *s/Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**United States District Judge**

**NOTICE TO PLAINTIFF**

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take **90 days** or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.